[22 NYS3d 3]

The Bank of New York Mellon, Solely as Securities Administrator for J.P. Morgan Mortgage Acquisition Trust 2006-WMC4, Respondent, v WMC Mortgage, LLC, Defendant, and J.P. Morgan Mortgage Acquisition Corporation et al., Appellants.

First Department, December 1, 2015

**APPEARANCES OF COUNSEL**

*Sullivan & Cromwell LLP*, New York City (*Darrell S. Cafasso* and *Robert A. Sacks* of counsel), for appellants.

*Boies, Schiller & Flexner LLP*, Armonk (*Motty Shulman, Richard E. Weill, Ian M. Dumain* and *Marc Ayala* of counsel), for respondent.

**OPINION OF THE COURT**

MOSKOWITZ, J.

This breach of warranty action arises from a residential mortgage backed securitization called the J.P. Morgan Mortgage Acquisition Trust 2006-WMC4 (the Trust). The Trust was arranged and sponsored by defendant J.P. Morgan Mortgage Acquisition Corporation (JPMMAC), which made certain representations and warranties as to the quality of the mortgage loans in the Trust. We find that plaintiff's interpretation of the language of the representation and warranty at issue is the only reasonable interpretation, and therefore affirm the motion court's denial of JPMMAC's motion to dismiss the causes of action based on its alleged breach of that representation and warranty.

Securitization is a financing tool used to pool and convert assets such as residential mortgages into financial instruments that can be sold in the capital markets. Mortgages on residential real estate are commonly securitized because the borrower has an obligation to make regular payments, which offer investors a consistent and predictable cash flow. By buying residential mortgage backed securities, investors acquire the right to receive money from the cash flows of the underlying mortgage

loans or from their proceeds, such as loan principal and interest. Accordingly, investors are necessarily concerned with, among other things, the credit quality of the underlying mortgage loans, as it directly affects the cash flow from the loans.[1]

A series of interlocking agreements controlled the securitization process. The first was a Mortgage Loan Sale and Interim Servicing Agreement (MLSA) dated as of July 1, 2005. Under the MLSA, defendant WMC Mortgage, LLC sold to JPMMAC all of its rights in certain mortgage loans that WMC owned or originated.[2] The sale of the loans was to close on October 30, 2006 (the whole loan sale date). The second relevant document was an Assignment and Assumption Agreement dated as of December 20, 2006, under which JPMMAC sold a substantial portion of the mortgage loans to a special purpose entity, J.P. Morgan Acceptance Corporation I (the depositor). Finally, under the Pooling and Servicing Agreement, dated as of December 1, 2006, the depositor transferred the loans into the Trust; defendant JPMorgan Chase Bank, N.A. (together with JPMMAC, JPMorgan) serviced the loans. The closing date for the transaction was December 20, 2006 (the closing date).

The MLSA contained numerous representations and warranties that WMC, as originator, made to JPMMAC concerning the nature and quality of the mortgage loans and the mortgage loan files eventually deposited into the Trust. As relevant here, in the MLSA, WMC represented and warranted to JPMMAC "as of the related Closing Date"—that is, October 30, 2006—that "[t]he information set forth in the Mortgage Loan Schedule and the tape delivered by [WMC] to [JPMMAC] is true, correct and complete in all material respects."[3] The Mortgage Loan Schedule, as defined in the MLSA, described each mortgage loan and, for each one, set forth extensive information concerning the likelihood of repayment—for example, the loan-to-value (LTV) ratio at origination, the appraised value of the mortgaged

---

1. The facts are taken from the complaint and accepted as true for the purposes of the CPLR 3211 motion.

2. Defendant WMC Mortgage, LLC is sued here as the successor in interest to WMC Mortgage Corporation; the latter entity actually entered into the MLSA. For ease of reference, the company will be referred to throughout this decision by its current name.

3. "The tape" refers to the loan tape, which contains "key statistics about each underlying loan in the pool" (*MBIA Ins. Corp. v Countrywide Home Loans, Inc.*, 87 AD3d 287, 292 [1st Dept 2011]).

property, the occupancy status of the mortgaged property at the time of origination, and the borrower's credit score.

The representation and warranty at issue on this appeal appears in section 2.06 (a) (iii) of the Pooling and Servicing Agreement. In that section, JPMMAC represented and warranted to plaintiff:

> "With respect to the period from [the] Whole Loan Sale Date to and including the Closing Date, [JPMMAC] hereby makes the representations and warranties contained in paragraph (a) . . . of Schedule 4 attached hereto . . . [that] [t]he information set forth in the Mortgage Loan Schedule and the tape delivered by [WMC] to [JPMMAC] is true, correct and complete in all material respects."

The Pooling and Servicing Agreement also provided that, if JPMMAC breached a representation or warranty it made in section 2.06, it was to cure the breach within 90 days after notification; if it failed to do so, it was to repurchase the defective mortgage loan or substitute a qualifying loan for the defective one.

In September and November 2012, certain certificate holders notified WMC, JPMorgan, and plaintiff, the securities administrator for the Trust, that many of the mortgage loans were plagued by high rates of delinquency and default and that more than 40% of the remaining collateral was delinquent. According to the certificate holders, these deviations constituted material breaches of the MLSA and Pooling and Servicing Agreement, both of which represented that the mortgage loans conformed to their description in the Mortgage Loan Schedule and the loan tape, and therefore misled investors about the quality and content of the mortgage loans in which they were investing. Accordingly, the certificate holders demanded that WMC and JPMMAC repurchase the breaching mortgage loans. JPMMAC refused the demand, and this suit ensued.

On February 24, 2013, plaintiff commenced this action, alleging, among other things, breach of representations and warranties (the third cause of action) and breach of contract for failure to repurchase the purportedly defective mortgage loans (the fourth cause of action). JPMMAC moved to dismiss the complaint under CPLR 3211 (a) (1) and (7); in an order entered November 22, 2013, the motion court denied the motion with respect to all causes of action except one not at issue on this appeal (41 Misc 3d 1230[A], 2013 NY Slip Op 51934[U] [Sup Ct, NY County 2013]).

JPMorgan now appeals from so much of the order as denied the motion to dismiss the third and fourth causes of action and the seventh cause of action to the extent it is based on breach of JPMMAC's warranties.

JPMorgan argues that section 2.06 (a) (iii) was a "gap" or "bring-down" warranty, meant to ensure that there was complete warranty coverage up until the closing date, and thus, that the section covered only instances where defects in the mortgage loans arose during the warranty period—that is, the period from the whole loan sale date to the closing date. Therefore, JPMorgan argues, it can be held liable only to the extent that the Mortgage Loan Schedule and the loan tape *became* inaccurate during that period. In the alternative, JPMorgan argues that section 2.06 (a) (iii) is ambiguous and that the matter should be remitted for the admission of extrinsic evidence to show the parties' intent. We reject both arguments.

■ A contractual provision that is clear on its face "must be enforced according to the plain meaning of its terms" (*Banco Espírito Santo, S.A. v Concessionária Do Rodoanel Oeste S.A.*, 100 AD3d 100, 106 [1st Dept 2012]; *see D.B. Zwirn Special Opportunities Fund, L.P. v SCC Acquisitions, Inc.*, 74 AD3d 530, 532 [1st Dept 2010]). This rule applies "with even greater force in commercial contracts negotiated at arm's length by sophisticated, counseled businesspeople" (*Ashwood Capital, Inc. v OTG Mgt., Inc.*, 99 AD3d 1, 7 [1st Dept 2012]). In addition, "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing" (*Reiss v Financial Performance Corp.*, 97 NY2d 195, 199 [2001] [internal quotation marks omitted]).

Plaintiff's claim against JPMorgan accords with section 2.06 (a) (iii) of the Pooling and Servicing Agreement. Section 2.06 (a) (iii) states that "[w]ith respect to the period from [the] Whole Loan Sale Date to and including the Closing Date," JPMMAC warrants that the representations in the Mortgage Loan Schedule and loan tape are correct. There is simply no language in this warranty addressing when the defects in the loans must arise for JPMMAC to be held liable for a misrepresentation on the Mortgage Loan Schedule or loan tape. Rather, the language of section 2.06 (a) (iii) is straightforward: if false information—for example, information about a borrower's income or the loan-to-value ratio of a mortgage—was on the Mortgage Loan Schedule and loan tape before October 30, 2006,

it constitutes a breach of JPMMAC's warranties as long as it remained on the Mortgage Loan Schedule or loan tape during the warranty period (that is, October 30, 2006 to December 20, 2006). Stated another way, JPMMAC warranted against the existence of any material misstatement during the warranty period, no matter when the misstatements first appeared on the Mortgage Loan Schedule or loan tape.

Indeed, bring-down representations are a common enough feature in financial contracts such as the one presented here; if JPMMAC, a commercially sophisticated entity, had intended that its representation would be operative only if the Mortgage Loan Statement became untrue between October 30, 2006 and December 20, 2006, it could well have expressed this intent in the representation by clearly so stating. For example, section 2.06 (a) (iii) could have been written in such a way as to make JPMMAC liable only if the representation was rendered untrue by events occurring between October 30 and December 20. However, as section 2.06 (a) (iii) is written, JPMMAC warrants the truth of the information in the Mortgage Loan Schedule between the two dates without regard to when the defects in the loans arose (*see e.g. Matter of Goldstein v Plotnicki*, 301 AD2d 483 [1st Dept 2003]).

Despite JPMorgan's argument otherwise, this interpretation of section 2.06 (a) (iii) does not render the phrase "[w]ith respect to the period from [the] Whole Loan Sale Date to and including the Closing Date" meaningless or superfluous. On the contrary, section 2.06 (a) (iii) as written means that JPMMAC will not be liable for loan misrepresentations in pre-warranty-period documents, but will be liable if any misrepresentations still exist on the Mortgage Loan Schedule or loan tape during the warranty period. This type of scenario is not hard to imagine—for instance, had JPMMAC, in the process of its due diligence, discovered defects in a certain loan before that loan was transferred to the depositor or the Trust, it could have removed the defective loan from the Mortgage Loan Schedule and substituted a nondefective one. Similarly, if the Mortgage Loan Schedule or the tape was incorrect on July 1, 2005 (the date of the MLSA) but WMC corrected the error before October 30, 2006, then JPMMAC would not be liable under section 2.06 (a) (iii). This interpretation is a perfectly reasonable reading of the operative phrase in section 2.06 (a) (iii), and does not leave it without meaning in the context of the Pooling and Servicing Agreement.

Nor does this interpretation of section 2.06 (a) (iii) ignore the Trust's structure, as section 2.06 (a) (iii)'s warranty period narrows JPMMAC's obligations so that JPMMAC's liability for false statements on the Mortgage Loan Schedule or loan tape is limited to the warranty period only. WMC's warranties, on the other hand, give it broader liability, with representations beyond the ones that JPMMAC makes in section 2.06 (a) (iii). For example, WMC warrants and represents in the MLSA that there are no pending environmental actions relating to the mortgaged properties and that the mortgaged properties are free from any toxic and hazardous substances. Likewise, WMC warrants in the MLSA that none of the mortgagors on any mortgage loan agreed to submit to arbitration related to the mortgage loan transactions. These representations and warranties are unrelated to the information on the Mortgage Loan Schedule—the only document to which JPMMAC's representations and warranties apply.

JPMorgan further contends that section 2.06 (a) (iii) must be a gap warranty because some of the fields listed in the definition of "Mortgage Loan Schedule" represent data as of some point after the origination of the mortgage loans—for example, the 12-month history for each mortgage loan with number of days delinquent in the past 12 months, and the next due date of the mortgage loan. Thus, JPMorgan argues, it is logical and sensible to interpret section 2.06 (a) (iii) as a gap or bringdown warranty because some of the relevant information could have changed or only become known in the period between the whole loan sale date and the closing date.

██ We find this argument unpersuasive. It is true that some of the items on the Mortgage Loan Schedule and loan tape could change after origination. Nonetheless, there were many items that, by definition, could not change—for example, the Mortgage Loan Schedule lists "LTV at origination" and the "original principal amount of the [m]ortgage [l]oan." Nothing in the language of section 2.06 (a) (iii) suggests that JPMMAC was making its representation as to the changeable items on the Mortgage Loan Schedule but not the unchangeable ones; it was making representations as to all the statements on the Mortgage Loan Schedule, which comprised both changeable and unchangeable information. Because JPMMAC was warranting the veracity of information that, by definition, could not change after the origination date, the warranty was not merely a bring-down or gap warranty.

For the reasons set forth above, we also reject JPMorgan's contention that section 2.06 (a) (iii) is ambiguous. " '[A] contract is not rendered ambiguous just because one of the parties attaches a different, subjective meaning to one of its terms' " (*Bajraktari Mgt. Corp. v American Intl. Group, Inc.*, 81 AD3d 432, 432 [1st Dept 2011]). The unambiguous language in the Pooling and Servicing Agreement provides that JPMMAC will be deemed to have breached the agreement if the information in the Mortgage Loan Statement and loan tape is not correct at any point from October 30, 2006 to December 20, 2006.

We have considered JPMorgan's remaining contentions and find them without merit.

Accordingly, the order of the Supreme Court, New York County (Shirley Werner Kornreich, J.), entered November 22, 2013, which, to the extent appealed from as limited by the briefs, denied defendants J.P. Morgan Mortgage Acquisition Corporation and JPMorgan Chase Bank, N.A.'s motion pursuant to CPLR 3211 (a) (1) and (7) to dismiss the third and fourth causes of action and so much of the seventh cause of action as is based on breach of JPMMAC's warranties, should be affirmed, with costs.

TOM, J.P., SWEENY, ANDRIAS and GISCHE, JJ., concur.

Order, Supreme Court, New York County, entered November 22, 2013, affirmed, with costs.