**FOURTH DIVISION**
**ELLINGTON, P. J.,**
**BRANCH and MERCIER, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**July 13, 2016**

# In the Court of Appeals of Georgia

A16A0659. GAPIII, INC. v. SEAL INDUSTRIES, INC.

BRANCH, Judge.

This case involves the interpretation and application of two contracts entered into in January 2011 between Seal Industries, Inc., and its subsidiaries and/or related companies (collectively, "Seal") and G. L. Ohrstrom & Co., GAPIII, Inc., Hillside Capital Incorporated, and the Ampex Retirement Trust (collectively, "the Managers"). The first of these contracts was a Management Services Agreement ("the MSA"), pursuant to which Seal agreed to pay each of the Managers a specified amount in exchange for the provision of management services. The second contract was a Subordination Agreement ("the SA"), which subordinated the Managers' right to receive payment of their fees under the MSA to the payment rights of Seal's lender, Fifth Third Bank ("the Bank"). After Seal unilaterally terminated the MSA as to

GAPIII, that company filed the current lawsuit seeking declaratory and injunctive relief as to its rights under the MSA. Seal counterclaimed for breach of the SA, arguing that the agreement barred GAPIII from suing under the MSA so long as Seal was in default under its loan agreement with the Bank.[1] The parties filed cross motions for summary judgment and following a hearing, the trial court entered an order granting Seal's summary judgment motion, dismissing GAPIII's claims, and denying GAPIII's motion for summary judgment as moot. GAPIII now appeals from that order, arguing that the trial court erred in finding that the SA precludes GAPIII's lawsuit for equitable relief, as the plain language of that agreement bars only a lawsuit seeking the payment of any monies owed under the MSA. GAPIII further asserts that the trial court erred in denying its motion for summary judgment, which sought a declaration as to the continuing validity of the MSA as to GAPIII, as well

---

[1] Given that the trial court clerk failed to include a copy of Seal's answer in the appellate record, our information regarding the nature of Seal's counterclaim is taken from Seal's summary judgment motion and appellate brief and the trial court's order.

2

as a mandatory injunction requiring Seal to allow GAPIII to perform its obligations under the MSA and to assist with the management of Seal.[2]

For reasons explained more fully below, we agree with GAPIII that the trial court erred in finding that the Subordination Agreement bars GAPIII from bringing the current lawsuit. Accordingly, we reverse the trial court's grant of summary judgment to Seal on its counterclaim for breach of the SA. We further hold that because the MSA contains a termination provision, that agreement remains in effect as to all parties, including GAPIII, until terminated in accordance with that provision. Finally, we find that further proceedings are required on GAPIII's claim for a mandatory injunction. We therefore remand the case for entry of an order granting GAPIII's request for declaratory relief and for further proceedings on GAPIII's request for injunctive relief.

---

[2] GAPIII's complaint actually requests a declaratory judgment that "Seal must allow GAPIII to perform its obligations under the [MSA] and allow [GAPIII] to assist with the management of Seal." In substance, however, as explained more fully in Division 2 of this opinion, this request for relief seeks a mandatory injunction against Seal. We therefore view the complaint as seeking both declaratory and injunctive relief. See *Forest City Gun Club v. Chatham County*, 280 Ga. App. 219, 220 (633 SE2d 623) (2006) ("pleadings, motions, and orders are construed according to their substance and function and not merely by nomenclature") (footnote omitted).

In reviewing a grant or denial of summary judgment, we owe no deference to the trial court's ruling and we review de novo both the evidence and the trial court's legal conclusions. *Muscogee County Bd. of Tax Assessors v. Pace Indus.*, 307 Ga. App. 532-533 (705 SE2d 678) (2011). "Similarly, the construction of a contract, including the existence or nonexistence of any ambiguities found therein, represents a question of law for the court, subject to a de novo standard of review on appeal." *Kerwood v. Dinero Solutions*, 292 Ga. App. 742, 742 (666 SE2d 40) (2008) (citations omitted).

The relevant facts in this case are undisputed, and the record shows that GAPIII is a corporation owned solely by George A. Pfeil, III. G. L. Ohrstrom & Co. ("GLO") is a private investment firm in which Wright Ohrstrom, the current President and Chairman of the Board of Seal, is a principal. In 2009, Pfeil was an employee of GLO, and part of his job was to find investment opportunities for GLO, including potential corporate acquisitions. When a corporate target was found, GLO would form a holding company, raise capital from investors, and then have the holding company purchase the target entity. As an employee of the company, Pfeil had the right to invest personally in any of the GLO-led acquisitions. GLO formed Seal in

4

2009 for the purpose of acquiring Seal Tech, Inc.,[3] and Pfeil, acting through GAPIII, made a personal investment in Seal.

After Seal acquired Seal Tech, Ohrstrom and Pfeil became general partners for the purpose of managing Seal, with Pfeil taking the majority of the management responsibility.[4] GLO and GAPIII then entered into a Management Services Agreement with Seal (the "original MSA") pursuant to which Seal paid a management fee of $200,000 per year, with GLO and GAPIII splitting that fee equally. The original MSA remained in place until January 2011, at which time Seal purchased Seal Tech's largest competitor, Environmental Analytics ("EA"). To achieve the acquisition of EA, Seal required additional capital. Two entities represented by Brookside Equity Partners, Hillside Capital Incorporated and the Ampex Retirement Master Trust (collectively, "the Brookside entities"), provided that capital and invested in Seal. At that time, the parties replaced the original MSA with an "Amended Restated Management Services Agreement" (the MSA at issue). Under

---

[3] Seal has been described as an "environmental compliance and services business," and its business includes leak detection and repair.

[4] Ohrstrom testified that he and Pfeil "set up" a general partnership for management of Seal. It is unclear from the record, however, whether a separate legal entity was created reflecting that general partnership.

5

the MSA, Seal contracted with GLO, GAPIII, and the Brookside entities for the provision of management services. The Managers were "to provide financial, administrative, investor relations and other managerial services to [Seal] as may be agreed from time to time during the term of this Agreement." To facilitate the performance of these managerial services, Seal was obligated to "furnish information to the Managers regarding [Seal] as frequently as shall be reasonably necessary." In exchange for their services, the Managers were to receive a fee of $400,000 annually. Under the terms of the MSA, GAPIII was to receive 50 percent of this fee, the Brookside entities 30 percent, and GLO 20 percent, with the amounts due each entity to be paid in monthly installments. The MSA further provided, however,

> if [Seal is] unable to pay the Management Fee in whole or in part for any reason, . . . the Managers shall be entitled to receive the entire amount of all such deferred Management Fees as soon as practicable thereafter. If [Seal is] unable to pay the Management Fee in whole, [Seal] agree[s] to pay each of the Managers a pro rata portion of the Management Fee that [Seal is] able to pay in proportion to the full amount of the Management Fee that each such Manager is entitled to receive.

Finally, the MSA states that the agreement "shall continue in full force and effect until terminated by mutual consent of the parties hereto. The accrued and unpaid obligations of [Seal] owed through the date of termination of [the MSA] shall survive

6

any termination or expiration of this Agreement to the maximum extent permitted under applicable law."

In conjunction with Seal's January 2011 acquisition of EA, Seal also entered an amended and restated loan and security agreement with Fifth Third Bank. As a condition of restructuring Seal's debt and loaning the company additional funds, the Bank required that Seal, EA, and each of the Managers execute the Subordination Agreement at issue. The SA designated Seal, EA, and certain related and subsidiary companies as the "Borrowers;" designated GLO, GAPIII, Hillside, and Ampex, as the "Subordinating Parties;" and defined the "Subordinated Indebtedness" as "[a]ny and all obligations and indebtedness, now or hereafter owing or due from any one or more of the Borrowers to any one or more of the Subordinating Parties pursuant to the Management Agreement." Under the terms of the SA, the Subordinated Indebtedness "shall be subordinate and inferior to any and all indebtedness, obligations and liabilities of each of the Borrowers, now or hereafter owed, or contingently owing, to the Bank under the Loan Agreement . . . ." The Subordination Agreement further provided, in relevant part:

> Without the prior written consent of the Bank, . . . except for regularly scheduled payments of Management Fees pursuant to the Management

7

Agreement in effect on the date hereof (but only so long as no Default or Event of Default [under the Loan Agreement] has occurred and is continuing or would be caused by the making of any such payment), none of the Subordinating Parties will ask, demand, sue for, take or receive from any person or party. . . the whole or any part of the Subordinated Indebtedness, unless and until all Bank Obligations shall have been fully paid.

At the end of 2011, GLO, GAPIII, and the Brookside entities all agreed to begin deferring payment of the management fees owed each under the MSA. Thus, since that time those fees have accrued, but have not been paid.[5]

At a meeting of Seal's Board of Directors held on June 4, 2014, Ohrstrom informed the Board that GLO intended to exercise its rights under the shareholder agreement to appoint a majority of Seal's directors and it therefore planned to "re-slate the Board." Approximately three weeks later, on June 24, 2014, the Seal Board met again by teleconference. Pfeil was not informed of this meeting and therefore was not in attendance at the same. At that meeting, Ohrstrom was elected Chairman of the Board; Pfeil was removed from the Board and was also removed as an officer of Seal; Ohrstrom was named as Seal's Vice President; and "the Board determined" that the

---

[5] The accrued fees owed each of the four Managers is reflected on Seal's balance sheets and/or its other financial records.

8

"services … being provided by … Pfeil … under [the MSA] were no longer required by the Corporation." Seal admits, however, that in making its determination regarding Pfeil's services, the Board never discussed the MSA's termination provision. According to Ohrstrom, who testified as Seal's 30 (b) (6) representative,[6] no such discussion was necessary because the Board "didn't change anything in the MSA. We just didn't need Mr. Pfeil's services anymore." Based on the Board's decision at its June 24 meeting regarding Pfeil's services, Seal contends that as of that date, the MSA "[was] still in effect between [the] Brookside [entities], GLO, and Seal, but not as between GAPIII and Seal." Accordingly, Seal took the position that the management fees owed GAPIII under the MSA ceased to accrue as of June 30, 2014.[7]

---

[6] Under Georgia's Civil Practice Act, where a corporation is named as a deponent, that company "shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf . . . . The persons so designated shall testify as to matters known or reasonably available to the organization." OCGA § 9-11-30 (b) (6).

[7] Ohrstrom also testified that as of June 30, 2014, both GLO and the Brookside entities had ceased accruing management fees – i.e., that those companies had ceased charging management fees to Seal, at least temporarily. There is no document or other evidence in the record, however, evidencing such an agreement. Moreover, Ohrstrom testified that the MSA remained in effect as to GLO and the Brookside entities, and both Ohrstrom's deposition testimony and Seal's pleadings reflect Seal's position that the MSA has been neither terminated nor amended.

9

In July 2014, GAPIII filed the current suit against Seal in Fulton County Superior Court. The original complaint asserted claims for declaratory and injunctive relief, breach of contract, and attorney fees. On March 27, 2015, Seal filed a motion seeking summary judgment on its counterclaim for breach of the Subordination Agreement, arguing that the SA barred GAPIII's lawsuit. The parties thereafter completed discovery, and on May 1, 2015, GAPIII filed an amended and restated complaint asserting claims only for declaratory and injunctive relief and attorney fees. Seal then agreed to extend the time in which GAPIII could file its response to Seal's summary judgment motion. GAPIII subsequently filed both a response to Seal's motion for summary judgment and a cross-motion for summary judgment on its claims against Seal. The trial court held a hearing on the summary judgment motions, during which it held that the Subordination Agreement barred GAPIII's lawsuit. Specifically, the trial court found that the SA precluded GAPIII from filing any kind of action against Seal under the MSA. The court thereafter entered an order granting summary judgment in favor of Seal on its counterclaim for breach of the Subordination Agreement, dismissing all of GAPIII's claims, and denying GAPIII's motion for summary judgment as moot. GAPIII now appeals from that order.

1. GAPIII argues that the trial court erred in granting Seal's motion for summary judgment. We agree.

The trial court's grant of summary judgment to Seal was based on its finding that the Subordination Agreement barred GAPIII's lawsuit for declaratory and injunctive relief. The SA provides that it will be governed by Georgia law, and under that law, "the cardinal rule of contract construction is to ascertain the intent of the parties, as evidenced by the language of the contract. . . . [I]f the terms of a contract are plain and unambiguous, the contractual terms alone determine the parties' intent." *Miller v. GGNSC Atlanta*, 323 Ga. App. 114, 118 (2) (746 SE2d 680) (2013) (citations and punctuation omitted). Here, the language of the Subordination Agreement provides that Seal's Managers may receive "regularly scheduled payments of Management Fees" due under the MSA so long as Seal is not in default on its obligations to the Bank. The SA further states that none of the Managers, as Subordinating Parties, may "ask, demand, sue for, take, or receive . . . the whole or any part of the Subordinated Indebtedness unless and until all Bank Obligations shall have been fully paid." "Subordinated Indebtedness," in turn, is defined to include "[a]ny and all *obligations and indebtedness*, now or hereafter owing or due" under the MSA. (Emphasis supplied.)

In support of its summary judgment motion, Seal argued that the word "obligations," as used in the definition of Subordinated Indebtedness, refers to legal duties of any kind, and not just financial obligations. So read, the Subordination Agreement bars any of the Managers from bringing any kind of suit under the MSA, including a suit that seeks only equitable relief. GAPIII, on the other hand, argues that the term "obligations," when read in the context of the Subordination Agreement as a whole, bars GAPIII only from suing to recover any deferred or accrued management fees currently owed it under the MSA.

Given the parties' reasoned disagreement as to the meaning of the term "obligations," that term, as used in the MSA, is ambiguous. We therefore resolve that ambiguity by applying the statutory rules of construction to ascertain the intent of the parties. Those rules require us to interpret any isolated clauses and provisions of the contract in the context of the agreement as a whole [.]" *Willesen v. Ernest Communications*, 323 Ga. App. 457, 459-460 (1) (746 SE2d 755) (2013) (citations and punctuation omitted). Here, the recitations contained in the Subordination Agreement provide, in relevant part, that:

> [Seal] and [the] Bank have executed and delivered that certain Second Amended and Restated Loan and Security Agreement, dated as of the

12

date here of, as amended, modified, supplemented or restated from time to time (the "Loan Agreement" . . . ); . . . The Subordinating Parties and [Seal] have entered into that certain Amended and Restated Management Services Agreement . . .whereby the Subordinating Parties shall provide certain management services to [Seal] in return for management fees (the "Management Fees"); and . . . [the] Bank has conditioned its agreement to enter into the Loan Agreement on the agreement of each of the Subordinating Parties to *subordinate the Management Fees* on the terms provided [herein].

(Emphasis supplied).

These recitations make clear that the purpose of the Subordination Agreement was to insure that none of the Managers were paid under the MSA unless the Bank was being paid under the terms of Loan Agreement. Additionally, the SA was also meant to insure that none of the Managers could seek payment of any deferred or accrued management fees until Seal had paid in full its debt to the Bank. In light of the clear purpose of the Subordination Agreement, we find that the parties intended the phrase "obligations and indebtedness" to refer only to any management fees – current, deferred, accrued, or otherwise – owed by Seal to the Managers. As used in the SA, therefore, the term "obligations" does not refer to any non-monetary obligations or legal duties, such as the duty of good faith, that Seal might owe its

13

Managers under that contract.[8] See *Moran v. Erk*, 11 NY3d 452, 456 (901 NE2d 187) (2008) (New York law imposes an implied duty of good faith and fair dealing upon contracts, and this duty requires that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract"). Accordingly, we find that the Subordination Agreement bars GAPIII only from suing to recover any management fees that are owed it under the MSA; it does not bar GAPIII's claims for equitable relief.[9] Thus, GAPIII's suit seeking both a declaration as to its rights under the MSA and injunctive relief does not breach the SA.

Seal attempts to avoid this conclusion by arguing that even if the term "obligations," as used in the Subordination Agreement, refers only to monies owed

---

[8] This conclusion comports with Seal's understanding of the Subordination Agreement, as expressed by its 30 (b) (6) representative, Ohrstrom. When asked for Seal's understanding of the Subordination Agreement, Ohrstrom replied that the agreement "outlines those *monies, securities, fees payable*, et cetera which are subordinated to the senior lender being paid." (Emphasis supplied.)

[9] In this regard, we note that had the parties to the Subordination Agreement intended to bar the Managers from bringing *any* suit under the MSA, regardless of the nature of the claim being asserted, then the Subordination Agreement could (and should) have expressed that intent in unequivocal terms. And we are not at liberty to rewrite the contractual clause at issue under the guise of interpreting it. See *Rabun & Assoc. Constr. v. Berry*, 276 Ga. App. 485, 487 (1) (623 SE2d 691) (2005).

under the MSA, GAPIII's lawsuit nevertheless breaches the SA. This breach results from the fact that if GAPIII prevails in its request for declaratory relief, that declaration "will impose upon Seal a present obligation to *pay*," at some time in the future, the management fees owed GAPIII under the MSA that accrued after June 30, 2014 "for services from GAPIII that Seal no longer desires." (Emphasis in original.) This argument is without merit.

As discussed infra in Division 2, the MSA has not been terminated as to GAPIII. Even in the absence of declaratory relief, therefore, Seal would remain liable for management fees accrued to GAPIII after June 30, 2014. Thus, a declaration of GAPIII's rights at this juncture will not create any financial obligations that Seal would not otherwise have under the MSA. GAPIII is still barred from receiving payment of any monies owed it under the MSA until the terms of the Subordination Agreement have been met. The declaratory judgment sought by GAPIII determines only whether that company has been improperly excluded from accruing fees under the MSA.

Finally, Seal also argues that even if the Subordination Agreement does not bar a claim for declaratory relief, GAPIII is not entitled to seek such relief under Georgia law. Again, we disagree.

15

Georgia's Declaratory Judgment Act, OCGA § 9-4-1, et seq., provides, in relevant part:

> the respective superior courts of this state shall have power, upon petition or other appropriate pleading, to declare rights and other legal relations of any interested party petitioning for the declaration, whether or not further relief is or could be prayed, in any civil case in which it appears to the court that the ends of justice require that the declaration should be made; and the declaration shall have the force and effect of a final judgment or decree and be reviewable as such.

OCGA § 9-4-2 (b). Our Supreme Court has interpreted this language as granting the superior courts of this State the

> power to determine and settle by declaration any justiciable controversy of a civil nature where it appears to the court that the ends of justice require that such should be made for the guidance and protection of the petitioner, and when such a declaration will relieve the petitioner from uncertainty and insecurity with respect to his rights, status, and legal relations.

*State Farm Mut. Auto. Ins. Co. v. Mabry*, 274 Ga. 498, 500-501 (3) (556 SE2d 114) (2001), quoting *Calvary Independent Baptist Church v. City of Rome*, 208 Ga. 312, 314 (3) (66 SE2d 726) (1951).

16

A justiciable controversy exists "where a concrete issue is present, and there is a definite assertion of legal rights, and a positive legal duty with respect thereto, which are denied by the adverse party." *Higdon v. City of Senoia*, 273 Ga. 83, 85 (1) (538 SE2d 39) (2000) (citation and punctuation omitted). See also *Sierra Craft, Inc. v. T. D. Farrell Constr.*, 282 Ga. App. 377, 379 (1) (638 SE2d 815) (2006) ("[a] controversy is justiciable so as to entitle a plaintiff to declaratory relief if the interested parties assert adverse claims upon an accrued state of facts") (citations omitted). Such a controversy exists in this case. Specifically, GAPIII contends that because it has never been terminated in accordance with its terms, the MSA remains in effect and management fees have continued to accrue to GAPIII, even though the fees accrued to GAPIII since June 30, 2014 are not reflected on Seal's books. Seal, on the other hand, contends that its decision not to accept Pfeil's services under the MSA means that the agreement is not "in effect" as to GAPIII, that no management fees have accrued to GAPIII since June 30, 2014, and that Seal's books should not reflect that the company owes GAPIII any such fees. Seal nevertheless contends that declaratory relief is inappropriate in this case because "a party may not seek a declaratory judgment where a breach of contract action will afford the party full and

17

complete relief." *Pinnacle Benning, LLC v. Clark Realty Capital*, 314 Ga. App. 609, 613 (1) (724 SE2d 894) (2012). This argument fails for at least two reasons.

First, Seal's position assumes that GAPIII's right to assert a breach of contract action has accrued. See *Sierra Craft*, 282 Ga. App. at 379 (1) ("declaratory relief is not available where the rights of the parties have already accrued") (citation and punctuation omitted). As Seal has consistently argued throughout this litigation, however, under the terms of the Subordination Agreement, GAPIII currently has no right to file suit to collect the fees owed it under the MSA.

Moreover, it does not appear that such a suit, to be brought at some indeterminate time in the future, would adequately protect GAPIII's interests – i.e., given Seal's refusal to accrue management fees to GAPIII, such an action may not afford GAPIII "full and complete relief." The record in this case shows that Seal is a holding company, created for investment purposes. Thus, it appears that at some point in time Seal and/or its corporate assets will be sold to a third party. Additionally, Seal's 30 (b) (6) representative testified that the accrued but deferred management fees owed under the MSA are shown on Seal's balance sheets as a liability. Thus, potential investors, purchasers, and/or lenders are aware that such debts are owed by the company. This fact, in turn, serves to protect the entities to

whom the management fees have accrued.[10] Presumably, the sale of the company could not be accomplished without the liability being paid or at least assumed by the purchaser, unless some other agreement is reached with the parties to whom such fees are owed. As of now, however, Seal's corporate records reflect that no management fees have accrued to GAPIII since June 30, 2014, the date on which Seal allegedly terminated GAPIII from the MSA. Thus, in the absence of a declaratory judgment that the MSA remains valid and binding as to GAPIII, GAPIII has no way of protecting its rights to payment of those management fees that have accrued to it since June 2014, particularly given Seal's own declaration that GAPIII is no longer entitled to any such fees. In light of these circumstances, we find that this case is an appropriate one for declaratory relief. See *Mabry*, 274 Ga. at 501 (3) (policyholders could seek a declaratory judgment against insurer regarding their rights under the insurance contract, as the purpose of that suit was "to settle and afford [the policyholders] relief from uncertainty and insecurity with respect to rights, status, and other legal relations") (citations omitted); *Enron Capital & Trade Resources Corp. v. Pokalsky*,

_____

[10] Indeed, as discussed more fully below in Division 2, Ohrstrom explained that the MSA was drafted so as to protect the interests of the managing entities–i.e., to ensure that the managing entities were able to protect the investment of both their time and their money.

227 Ga. App. 727, 729 (1) (a) (490 SE2d 136) (1997) ("[d]eclaratory relief is available where a legal judgment is sought that would control or direct future action"), citing *Atlanta Cas. Co. v. Fountain*, 262 Ga. 16, 17 (413 SE2d 450) (1992).

As the foregoing discussion makes clear, the SA does not prohibit GAPIII's suit for equitable relief. In Division 2, therefore, we address whether GAP III is entitled to the declaratory and injunctive relief it seeks.

2. GAPIII argues that the trial court erred in denying its motion for summary judgment on its claims for a declaratory judgment. GAPIII sought a declaratory judgment that the MSA remained in effect as to GAPIII and that management fees therefore continued to accrue to the company under that contract. Additionally, GAPIII also sought a declaratory judgment that Seal must allow it to perform its obligations under the MSA by allowing Pfeil to participate in the management of Seal. We address each of these claims separately.

(a) The MSA contains a choice of law provision stating that it will be governed by New York law. Relevant New York law regarding the interpretation of contracts is similar, if not identical, to Georgia law. Like Georgia, New York law provides that contract interpretation is a question of law, *A. Gugliotta Dev. v. First American Title Ins. Co. of New York*, 976 N.Y.S.2d 172 (A. D. 2013), and New York law requires

20

that contracts be interpreted in view of the intent of the parties. *Schron v. Troutman Sanders, LLP*, 20 N.Y.3d 430, 433 (986 NE2d 430) (2013). That intent, in turn, "is generally discerned from the four corners of the [contract] itself." *MHR Capital Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 645 (912 NE2d 43) (2009). Thus,

> [a] contractual provision that is clear on its face must be enforced according to the plain meaning of its terms. This rule applies with even greater force in commercial contracts negotiated at arm's length by sophisticated, counseled businesspeople. In addition, courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.

*Bank of New York Mellon v. WMC Mtg.*, 22 N.Y.S.3d 3, 6 (A. D. 2015) (citations and punctuation omitted).

Here, the plain language of the MSA provides that it remains in effect "until terminated by mutual consent of the parties hereto." And the MSA further states that it "may not be amended except by a written agreement executed by the parties to this Agreement." Moreover, testifying on behalf of Seal, Ohrstrom stated that the MSA had been drafted by counsel; that it was similar to other MSAs that GLO had previously used when investing in companies; that the intent of the parties to the MSA was that the agreement would remain in place until the end of the GLO-led

21

investment in Seal; and that the MSA was written so as to allow the Managers, as general partners, "to be in control of [their] own destinies."

Despite this plain and unambiguous language and Seal's own understanding of the MSA, however, Seal contends that the MSA remains in effect as to GLO and the Brookside entities, but is no longer in effect with respect to GAPIII. Seal insists that it is no longer bound under the MSA with respect to GAPIII because Seal made the unilateral decision that it no longer wanted Pfeil's services. Moreover, according to Seal, the termination of the MSA as to GAPIII is valid, despite the fact that GAPIII never consented to that termination and despite the fact that the parties have never amended the MSA, either in writing or otherwise. Ohrstrom explained that Seal saw no need to amend the agreement to terminate it as to GAPIII because Seal "didn't change anything in the MSA, we just didn't need Mr. Pfeil's services anymore." Ohrstrom further explained that Seal did not "actually have to amend the agreement to choose not to take [Pfeil's] services . . . ." He then elaborated on Seal's view that the MSA "says that we will pay fees for services rendered, but we're not going to [continue to] pay fees . . . for no services rendered. That's what the [MSA] says."

Seal's position, however, is in direct conflict with the plain language of the MSA, which provides that the MSA remains in effect with respect to GAPIII, and

22

management fees continue to accrue to that company, until the MSA is terminated in accordance with its own provisions. Moreover, the fact that Pfeil is no longer providing services under the MSA does not change this conclusion. As Ohrstrom acknowledged, GAPIII has "made clear it is willing, ready, and able to provide [the] services" called for under the MSA. And New York law is clear "that where one party refuses to abide by the contract, and that refusal is not justified by the actions of the other party, the other party does not have a duty to continue his performance under that contract." *Royce v. Rymkevitch*, 289 N.Y.S.2d 598 (A. D. 1968). Thus, "a party to a contract cannot rely on the failure of another to perform when he has frustrated or prevented [that] performance." *A-1 Gen. Contracting v. River Market Commodities*, 622 N.Y.S.2d 378 (A. D.1995) (citation omitted). See also *Computer Possibilities Unlimited v. Mobil Oil Corp.*, 747 N.Y.S.2d 468 (A. D. 2002) ("a repudiation [by one party to the contract] discharges the nonrepudiating party's obligations to render performance in the future") (citations omitted). This rule has as its basis "the familiar principle that there is an implied obligation of good faith binding parties to contracts, that [one party] will not deliberately frustrate [the] performance" of the other, and this rule "exists to serve the intent of the parties, and does not operate at cross-purposes to that intent." *Roswell Capital Partners v.*

23

*Alternative Constr. Technologies*, 638 F. Supp. 2d 360, 370 (SDNY 2009) (citations and punctuation omitted). Accordingly, while Seal may have voted to relieve Pfeil of his management duties, that fact, without more, did not terminate or invalidate the MSA as to GAPIII.

Implicitly recognizing that its argument runs counter to the clear and unambiguous language of the MSA, Seal argues that unless we find that it had the authority to terminate unilaterally the MSA as to GAPIII, that contract becomes a perpetual contract, in violation of New York Law. This argument is wholly unpersuasive.

While New York law will not allow the enforcement of perpetual contracts, it distinguishes between "perpetual" and "indefinite" contracts. *Nicholas Laboratories v. Almay, Inc.*, 723 FSupp. 1015, 1018 (B) (S.D.N.Y. 1989), *aff'd*, 900 F2d 19 (2d Cir. 1990). "A perpetual contract runs without end or without provision for its termination. An indefinite contract runs without a fixed end but contains provisions under which the contract might terminate at any time." Id. "Thus where termination has been provided for in the contract, even if continuous performance is a possibility, courts should not refuse to enforce such contracts or read into them different conditions of termination." Id. (citations omitted). See also *Payroll Express Corp. v.*

24

*Aetna Cas. & Sur. Co.*, 659 F2d 285, 291-292 (2d Cir. 1981) ("New York [law] limits [the] policy [of voiding contracts that lack a defined duration] to contracts having no termination provisions and has held it inapplicable to contracts of the type before us here, which do provide for termination or cancellation upon the occurrence of a specified event") (citation omitted). In this case, the MSA contains a termination provision that specifies the conditions under which the agreement may be terminated by the parties. Accordingly, it is not a perpetual contract. See *Warner-Lambert Pharmaceutical Co. v. John J. Reynolds, Inc.*, 178 F. Supp. 655 (S.D.N.Y. 1959), *aff'd*, 280 F2d 197 (2d Cir.1960) (upholding contract entered into in 1881 that lacked termination date but which obligated pharmaceutical manufacturer to pay royalties on every gross of "Listerine" mouthwash made and sold by it as long as it continued to manufacture the product); *Ketcham v. Hall Syndicate*, 236 N.Y.S. 2d 206 (Sup. Ct. 1962), *aff'd on opinion below*, 242 N.Y.S.2d 182 (1st Dept. 1963) (agreement to create and provide cartoons indefinitely, subject to termination upon artist's share of revenue falling below stipulated amount was not a perpetual contract); *Ehrenworth v. George F. Stuhmer & Co.*, 229 N.Y. 210 (128 NE 108) (1920) (validating

agreement to sell bread to an exclusive distributor as long as both parties remained in business).[11]

In light of the foregoing, we find that the trial court erred in denying GAPIII's claim for declaratory judgment that the MSA remains in effect as to the company. On remand, therefore, the trial court shall enter an order granting GAPIII's request for declaratory relief on this issue.

(b) GAPIII also sought a declaratory judgment that Seal must allow the company to fulfill its duties under the MSA and allow Pfeil to assist with the management of Seal. Although styled as a claim for declaratory relief, GAPIII seeks, in substance, mandatory injunctive relief. See *Mabry*, 274 Ga. at 509-510 (5) (a mandatory injunction is one that requires a party to take some affirmative action, such as requiring "a party to perform contractual duties which the trial court has declared

---

[11] Seal cites *Conrad v. Golden*, 89 N.Y.S.2d 689 (A. D. 1949) for the proposition that a contract which provides it will terminate by mutual consent of the parties is, in fact, terminable at will. That portion of *Conrad* relied on by Seal, however, is nothing more than dicta. The actual holding in *Conrad* was that the contract at issue was "too vague and indefinite to be enforced[,]" as it failed to "set forth the full intention of the parties with such certainty and explicitness that the intention of the parties [could] be ascertained with a reasonable degree of certainty." Id. at 689.

that party is obligated to perform").[12] A mandatory injunction, however, is viewed as an extraordinary remedy, having been described as "the strong arm of equity." *Prime Bank v. Galler*, 263 Ga. 286, 289 (4) (430 SE2d 735) (1993) (citation and punctuation omitted). In light of that fact, and given that the parties have not briefed the question of whether GAPIII would be entitled to such relief, we remand this issue for consideration by the trial court in the first instance. See id. (remanding to the trial court to consider whether the plaintiff could be afforded some relief less drastic than a mandatory injunction).

For the reasons set forth above, we reverse the trial court's order and remand the case for further proceedings consistent with this opinion.

*Judgment reversed and case remanded. Ellington, P. J., and Mercier, J., concur in judgment only*.

---

[12] Although the MSA is governed by New York law, the relief available with respect to the MSA is governed by the law of Georgia, as the forum state. See *Brinson v. Martin*, 220 Ga. App. 638, 638 (1) (a) (469 SE2d 537) (1996) ("[u]nder the rule of lex fori, procedural or remedial questions are governed by the law of the forum, the state in which the action is brought") (citation and punctuation omitted).