**FIFTH DIVISION**
**MCFADDEN, P. J.,**
**BRANCH and BETHEL, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**March 15, 2018**

# In the Court of Appeals of Georgia

A17A1775. CROP PRODUCTION SERVICES, INC v. T. E.
    MOYE.

BRANCH, Judge.

Crop Production Services, Inc. ("CPS") brought suit against T. E. Moye, his daughter Mollie Squires, Mollie's husband Richard, and Gracie's Ridge, LLC, a company owned by Mollie and operated by her husband. The claims against Moye were based on his written guaranty of Gracie Ridge's account with CPS. Moye moved for partial summary judgment based on an alleged oral agreement in which CPS allegedly agreed to rescind or revoke Moye's obligations under the guaranty. The trial

court granted summary judgment on that ground, and CPS appeals. Because we find an issue of fact regarding that agreement, we reverse.[1]

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). "In reviewing a grant or denial of summary judgment, we owe no deference to the trial court's ruling and we review de novo both the evidence and the trial court's legal conclusions." *GAPIII, Inc. v. Seal Indus.*, 338 Ga. App. 101, 102 (789 SE2d 321) (2016). Moreover, we construe the evidence and all inferences and conclusions arising therefrom most favorably toward the party opposing the motion. *SKC, Inc. v. EMAG Solutions*, 326 Ga. App. 798, 798 (755 SE2d 298) (2014).

The record[2] shows that CPS is an agricultural products supply company that provided Gracie's Ridge, LLC, with agricultural products on account through a series

---

[1] We have circulated this decision among all nondisqualified judges of the Court to consider whether this case should be passed upon by all members of the Court. Fewer than the required number of judges, however, voted in favor of a hearing en banc on the question of overruling *Hendricks v. Enterprise Financial Corp.*, 199 Ga. App. 577 (405 SE2d 566) (1991) and *Brooks v. Gwinnett Community Bank*, 311 Ga. App. 806 (717 SE2d 647) (2011).

[2] The parties and the bar are reminded that under the rules of this Court, "[r]ecord and transcript citations shall be to the volume or part of the record or transcript and the page numbers that appear on the appellate record or transcript as sent from the trial court." Court of Appeals Rule 25 (a) (1).

of orders and deliveries. At all relevant times, Lavon Odom was the primary salesman in CPS's Arlington location responsible for the Gracie's Ridge account; he also held the title "manager" at that location for some portion of the relevant time and signed some documents as the "Branch Manager." In his role as a salesman, Odom was responsible for getting credit applications and other form documents signed by Gracie's Ridge in connection with the account. He would then submit the documents to the credit manager in CPS's area office in Tifton, which decided whether to grant credit. But according to CPS's internal rules, Odom did not have authority to grant credit to CPS's customers or to rescind or revoke a guaranty.

Moye is a college-educated farmer, former chairman of the Baker County Board of Commissioners, and former 30-year district field representative for the Georgia Farm Bureau. Moye had known and done business with Odom for twenty years, and Odom was the only CPS representative with whom Moye had any contact during the time relevant to this case. At all relevant times, Moye's daughter Molly Squires owned Gracie's Ridge and her husband operated the farming business and ordered products from CPS; other than advising Richard what to plant, Moye played no role in the company and never represented to CPS that he did. Moye did, however,

3

sign checks on behalf of Gracie's Ridge from time to time between 2011 and 2013; he was a signator on Gracie's Ridge's bank account during that time.

Moye testified that in about April 2011, he told Odom that he "wanted to get it fixed up where we could get the children some credit started." Consequently, on April 26, 2011, Moye entered into a Guaranty Agreement (the "First Guaranty") with CPS, "[i]n consideration of and to induce [CPS] extending credit to Gracie's Ridge." In this guaranty, Moye unconditionally guaranteed payment by Gracies' Ridge for "all goods for which credit has been or is so given." The First Guaranty provides that any notice of revocation had to be submitted in writing:

> This Guaranty Agreement shall continue until CPS shall receive from the undersigned, or any of the undersigned, written notice of revocation which revocation shall be effective only as to payment of purchase price on goods ordered by purchaser [Gracie's Ridge] (or contractual duties or obligations of purchaser arising) after the receipt thereof. Any such notice of revocation by any one of the undersigned shall not affect the obligations hereunder of any other of the undersigned.

Odom signed the guaranty as a witness. Thereafter, Gracie's Ridge began placing orders with CPS.

On February 5, 2013, Moye executed a one-paragraph guaranty located on a CPS Customer Profile and Commercial Credit Agreement for Gracie's Ridge. Odom

4

signed the document as CPS's "Branch Manager." This "Second Guaranty" provides that Moye

> guarantee(s) the payment . . . and assume(s) personal liability for the payment . . . of all obligations due and owing CPS for products and services to Applicant(s) pursuant to this request for credit. . . . *This guaranty is absolute, unconditional, and continuing and shall remain in effect until Applicant's (s') obligations have been paid, performed, and discharged in full*.

(Emphasis supplied.) The document indicates a credit limit of $60,000. Gracie's Ridge then continued to place orders on credit with CPS. But the balance on the Gracie's Ridge account hit zero on October 4, 2013, and Gracie's Ridge did not charge on the account again until March 12, 2014.

Meanwhile, in January 2014, Moye drove to CPS's Arlington location and met with Odom. Moye averred that he stated to Odom,

> Lavon, I'm quitting farming. I know that I have been working with these children these '11, '12 and '13, and I'm telling you I'm done. They are going to take the whole farming operation and I'm not going to guarantee anything that they purchase here, anything that they buy.

Moye testified that Odom replied, "I'm completely in agreement with you and I completely understand. . . . I agree. I understand you. I am in complete agreement

with you." Moye testified that he also gave Odom a signed writing evidencing revocation of the guaranty, but no writing has been produced and CPS denies having received one.

Odom testified to the same conversation as follows:

Q. Okay. You were told that the LLC was going to take over the farming operations in 2014?
A. I was. . . .
Q. Okay. You do recall Mr. Moye saying that he was no longer going to be involved in the farming operations, correct?
A. I do recall that. . . .
Q. And at that time do you recall Mr. Moye telling you that he was turning the farm over to Richard and Molly or the LLC?
A. I do.
Q. Do you recall him telling you that they were on their own?
A. I do.
Q. Okay. Do you recall him telling you that he would not be liable for any of their debt?
A. Yes, I do.
Q. And what did you say in response to that statement?
A. I agreed to it.
Q. And so you told him, yes, sir, I understand or --
A. Yes, sir.

In an affidavit, however, Odom purported to clarify that by stating that he understood, he meant merely that he understood Moye did not want to be liable for the Gracie's Ridge debt.

Gracie's Ridge resumed making charges on the account on March 12, 2014, and on June 25, 2014, Gracie's Ridge executed another CPS financing form, requesting from CPS an increased credit limit of $500,000 "valid for only purchases made between 6/1/14 and 12/31/14." This document is not signed by Moye but is signed by Odom as "Branch Manager." In handwriting, there is a "Recommendation" that states, "Suggest that Husband (Richard Squires) to sign as Guarantor." But CPS did not obtain any new guaranties in connection with this June 2014 document. Between March 2014 and April 2015, Gracie's Ridge resumed ordering product and its balance on the account rose to at least $247,000 three times and peaked at $285,111.35 on April 30, 2015. During this time, some payments on the account were made by Thomas Edward Land, LLC, and Notchaway Land & Cattle, LLC, entities controlled by Moye that have no relationship with Gracie's Ridge. And during the 2014 growing season, as well as the preceding years, CPS submitted the Gracie's Ridge bills to Moye at his address; Moye then took them to Gracie's Ridge's accountant, who paid them.

Eventually, when Gracie's Ridge failed to make payments on the account, CPS asked Moye to pay the debt based on his guaranties. Moye refused and CPS later filed suit against Moye, Molly and Richard Squires, and Gracie's Ridge. In Count 2 of the complaint,[3] CPS sought to recover from Moye on the two guaranties that he signed. Moye moved for summary judgment and argued, in part, that (1) regardless whether he gave Odom a written revocation, Moye was entitled summary judgment on both guaranties because an oral agreement to revoke a guaranty is enforceable as a matter of law and Odom, an agent of CPS, agreed to revoke the guaranties; and (2) any liability under the Second Guaranty was terminated when the account balance was paid in full as of October 4, 2013. The trial court granted Moye's motion for summary judgment on Count 2, finding only that "[Moye's] defense of rescission is a complete and valid defense." CPS appeals.

1. CPS first argues that the trial court erred because under the Statute of Frauds, revocation of a guaranty must be in writing to be effective. CPS contends in the alternative that there is an issue of fact as to whether the parties had a meeting of the minds to revoke or cancel the guaranties. For the reasons that follow, we hold that a

---

[3] None of the other counts, defenses, counterclaims, or parties are relevant to this appeal.

writing is not necessary where parties mutually agree to cancel an executory[4] guaranty subject to the Statute of Frauds, but that there is an issue of fact as to whether these parties agreed to rescind the guaranty.

(a) The Statute of Frauds provides that "[a] promise to answer for the debt. . . of another" must be in writing. OCGA § 13-5-30 (2); see also *Lafarge Bldg. Materials v. Thompson*, 295 Ga. 637, 639 (2) (763 SE2d 444) (2014) ("a personal guaranty of a debt is not enforceable unless it is in writing"). And it is well-established that "[a] contract which must, under the statute of frauds, be in writing, and which accordingly is put in writing and duly executed, cannot be subsequently modified by a parol agreement," *Gulf Oil Corp. v. Willcoxon*, 211 Ga. 462, 465 (86 SE2d 507) (1955) (citations omitted), "unless the oral agreement falls within an

---

[4] "While a valid executed contract cannot be discharged by a simple agreement, but only by performance, by release under seal, or by an accord and satisfaction, one that is executory (that is, one that has not been acted upon) may be discharged by an agreement of the parties that it shall no longer bind either of them." *Pope v. Thompson*, 157 Ga. 891 (122 SE 604) (1924). Here, at the time of the alleged oral agreement to cancel the guaranties, Gracie's Ridge did not owe CPS anything on its account; at that time, therefore, any future obligation on the guaranties was executory.

exception to the operation of the statute of frauds." *White v. Orton Indus.*, 224 Ga. App. 342, 343 (480 SE2d 620) (1997).[5]

The reason that a modification or alteration of an agreement covered by the statute must be in writing is that "every alteration is a new . . . contract, which, by the express terms of the statute, must be in writing." *Augusta Southern R. Co. v. Smith & Kilby Co.*, 106 Ga. 864 (33 SE 28) (1899) (citation and punctuation omitted). Similarly, "[i]f the contract may be altered in parol, then there is a contract on the subject-matter by parol, and that is forbidden by the statute"; an agreement covered by the statute "cannot rest partly in writing and partly in parol." Id. These reasons are important, as is explained by Williston:

> A failure to observe the reason why contracts within the statute of frauds cannot be varied by oral executory agreements has sometimes led to broad statements that written contracts can be altered only by another written contract, or by an executed oral agreement.

29 Williston on Contracts § 73:21 (4th ed.) (footnote omitted).

---

[5] See, e.g., OCGA § 13-5-31 (3) (Statute of Frauds inapplicable "[w]here there has been such part performance of the contract as would render it a fraud of the party refusing to comply if the court did not compel a performance").

Unfortunately, in *Hendricks v. Enterprise Financial Corp.*, 199 Ga. App. 577 (405 SE2d 566) (1991), this Court made the unwarranted logical leap Williston warned about. In *Hendricks*, this Court addressed whether evidence of a parol agreement between a creditor and a guarantor to release the guarantor created an issue of fact as to whether the guarantor remained obligated on the guaranty. Id. at 577-579. This Court quoted the rule that *modifications* to agreements that fall under the Statute of Frauds must be in writing to support its conclusion that an agreement *to rescind* a guaranty must also be in writing. Id. at 579 (2). But a mutual agreement to cancel, revoke, or rescind an executory contract is not a modification of an existing contract; it is a separate agreement to terminate the original agreement, which was subject to the Statute of Frauds. "[A] rescission is in itself a contract and depends on a mutual understanding and agreement" of the parties. *Fidelity Nat. Bank v. Reid*, 180 Ga. App. 428, 430 (2) (348 SE2d 913) (1986); see generally *Danforth v. Govt. Employees Ins. Co.*, 282 Ga. App. 421, 425 (4) (a) (638 SE2d 852) (2006) (distinguishing "cancellation," i.e., "abandonment of a contract," from modification of a contract).[6]

---

[6] Compare the definitions of "cancel" — "[t]o destroy a written instrument by defacing or obliterating it" or "[t]o terminate a promise, obligation, or right <the parties canceled the contract>"; "revoke" — "[t]o annul or make void by taking back or recalling; to cancel, rescind, repeal, or reverse"; and "rescind" — "[t]o abrogate or cancel (a contract) unilaterally or by agreement"; with the definition of "modification" — "[a] change to something; an alteration or amendment <a contract modification>." Black's Law Dictionary (10th ed. 2014).

Unlike when an agreement subject to the Statute of Frauds is modified, which results in a new agreement also subject to the Statute, a cancellation eliminates that agreement. Thus, the reasoning found in *Augusta Southern* as to why modifications are subject to the Statute of Frauds does not apply to cancellations. Moreover, regardless of the nature of the original agreement, nothing in the Statute of Frauds itself can be interpreted as applying to an agreement to cancel or rescind another agreement, regardless of the nature of the original agreement. See OCGA § 13-5-30.

Thus, here, the general rule applies — that is, that "parties to a contract may rescind it by mutual agreement and rescission of a written contract need not be in writing." *Thompson v. Lovett*, 328 Ga. App. 573, 576 (1) (760 SE2d 246) (2014) (citation and punctuation omitted); see also *WorksiteRx LLC v. DrTango, Inc.*, 286 Ga. App. 284, 285 (648 SE2d 775) (2007) (same); *Pope v. Thompson*, 157 Ga. 891, 896 (2) (122 SE 604) (1924) (there is a "requirement that the rescission should be clearly and satisfactorily proved"). In *Thompson*, this Court held that evidence of an oral agreement to rescind an agreement subject to the Statute of Frauds can create an issue of fact about whether the parties agreed to rescind; the agreement to rescind need not be in writing. Id. *Thompson* is also consistent with the Restatement of Contracts:

Notwithstanding the Statute of Frauds, all unperformed duties under an enforceable contract may be discharged by an oral agreement of rescission. The Statute may, however, apply to a contract to rescind a transfer of property.

Restatement (Second) of Contracts § 148 (1981).[7] And, if it can be proved, "[a] rescission of a contract by consent or a release by the other contracting party shall be a complete defense." OCGA § 13-5-7.

We hold that the trial court did not err by failing to apply the Statute of Frauds to bar evidence of a mutual oral agreement to rescind Moye's guaranties. We overrule *Hendricks*, 199 Ga. App. 577, and *Brooks v. Gwinnett Community Bank*, 311 Ga. App. 806, 807 (717 SE2d 647) (2011), which relied on the holding in *Hendricks*, to

---

[7] Although they do not mention the Statute of Frauds, there are several Georgia cases applying the rule that a contract for the sale of land, which is subject to the Statute of Frauds (see OCGA § 13-5-30 (4)), may be cancelled by a parol agreement between the parties. For example, in a case involving a contract for the sale of land, our Supreme Court has applied the rule that

> [an] executory [contract] . . . may be discharged by an agreement of the parties that it shall no longer bind either of them. The consideration on the part of each is the other's renunciation . . . and [ ] such agreement may be in parol as well as in writing.

*Holloway v. Giddens*, 239 Ga. 195, 197 (236 SE2d 491) (1977), overruled on other grounds by *Brown v. Frachiseur*, 247 Ga. 463 (277 SE2d 16) (1981); *Pope v. Thompson*, 157 Ga. 891 (same).

13

the extent they hold that a release from an agreement subject to the Statute of Frauds must be in writing.[8]

(b) Nevertheless, we conclude that there is an issue of fact as to whether there was a meeting of the minds. CPS submitted Odom's affidavit in which he averred that although he stated that he understood what Moye wanted, he never agreed to release Moye from the guaranty on the Gracie's Ridge account. Likewise, the question whether Odom had the authority to rescind the guaranties presents a question of fact. See *Wiggins v. Home Owners &c. of Metro. Atlanta*, 168 Ga. App. 777 (310 SE2d 554) (1983). See also OCGA § 10-6-1 ("The relation of principal and agent arises wherever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf.").

2. CPS also contends that the trial court erred because the guaranty itself required that notice of revocation be in writing. That contract provision, however,

---

[8] CPS's argument that the parol evidence rule bars consideration of the evidence of the alleged oral agreement misunderstands that rule. "[T]he parol evidence rule prohibits the consideration of evidence of a prior or contemporaneous oral agreement to alter, vary or change the unambiguous terms of a written contract." *First Data POS v. Willis*, 273 Ga. 792, 794 (1) (546 SE2d 781) (2001) (footnote omitted); OCGA § 24-3-1 ("Parol contemporaneous evidence shall be generally inadmissible to contradict or vary the terms of a valid written instrument."). The alleged agreement to rescind in this case came subsequent to the original written agreement.

14

clearly pertains to notice of a unilateral revocation by the guarantor, and has no bearing on whether the parties may agree to rescind the agreement. A mutual rescission of a guaranty takes effect regardless whether the written guaranty provides that it may only be discontinued upon written notice actually received. *Fidelity Nat. Bank*, 180 Ga. App. at 429-430 (2).

For the above reasons, we reverse the grant of summary judgment in favor of Moye on Count II.

*Judgment reversed. McFadden, P. J., and Bethel, J., concur.*